**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Allen John BAMBERGER, Defendant-Appellant.**

**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Barry SHIPLEY, Defendant-Appellant.**

**Nos. 71–2381, 71–3052.**

United States Court of Appeals, Ninth Circuit.

May 29, 1973.

Rehearings Denied July 5, 1973.

Certiorari Denied Nov. 19, 1973. See 94 S.Ct. 543.

T. Roger Duncan (argued), Los Angeles, Cal., David M. Rothman, Beverly Hills, Cal., for defendants-appellants.

Gregory C. Glynn, Asst. U. S. Atty. (argued), William D. Keller, U. S. Atty., Eric A. Nobles, Asst. U. S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before BROWNING, HUFSTEDLER and WALLACE, Circuit Judges.

WALLACE, Circuit Judge.

Bamberger and Shipley appeal their conviction of bank robbery in violation of 18 U.S.C. § 2113(a) and (d) asserting numerous errors. We affirm.

On the morning of June 20, 1969, three armed men entered a bank on South Western Avenue in Los Angeles. They wore dark clothes, gloves, and white motorcycle helmets with visors. People in the bank were able to give only general descriptions of the bandits.

The robbers left the bank three or four minutes after they had entered, having fired approximately five shots and taken about $2,075.00. Raymond Lawson, a construction worker who was outside the bank at the time of the robbery, saw three men wearing white motorcycle helmets and gloves exit the bank carrying guns and a money sack. The three men joined a fourth man who was in the driver's seat of a waiting automobile. Lawson could neither see their faces nor tell their race or ethnic origin, but he testified that he could recognize the three men by their height, weight and build. Lawson later identified Bamberger and Shipley in lineups and at trial as two of the three men he had seen at the scene of the robbery.

Sergeant McAlpine of the Los Angeles Police Department was stopped at a red

light on South Western Avenue in an unmarked police vehicle when the three men wearing white motorcycle helmets exited the bank. McAlpine pursued the getaway vehicle. He observed the occupants of the automobile take off their helmets. During the chase, one of the men leaned out of the right side of the vehicle and fired a small-caliber revolver five or six times at the police officer from a distance of approximately 100 feet. McAlpine saw his face and subsequently identified him as Shipley.

The getaway car came to a sudden stop at an alleyway and a man leaned out of the left side, firing a .45 caliber automatic hand gun. McAlpine, who was two car lengths away, identified this man as Bamberger. After a brief exchange of shots, the getaway car started down the alley at a high rate of speed. McAlpine's chase was frustrated when his car became inoperable.

## I. The Right to Free Transcripts.

Clifford Northern, the driver of the getaway car, was indicted and tried separately for the same bank robbery. His first trial ended in a hung jury. He was then retried and found guilty. *See* Northern v. United States, 455 F.2d 427 (9th Cir. 1972). Lawson and McAlpine testified at both trials. During the second Northern trial, both identified Bamberger and Shipley. The record does not disclose whether they did so in the first Northern trial.

■ Bamberger and Shipley were in possession of transcripts of the *first* Northern trial. Twenty days before his trial, Shipley moved for a transcript of the testimony given in the *second* North-

ern trial by Lawson, McAlpine, and a third witness.[1] The motion was denied. Bamberger and Shipley are indigents and claim that the denial of the right to the free transcript violates their rights to equal protection and due process. Because only Shipley moved for a free transcript, Bamberger is precluded from alleging that denial of the motion constituted error as to him.

■ The Supreme Court has held that equal protection requires that an indigent be provided "with the *basic tools* of an *adequate* defense . . . when those tools are available for a price to other [defendants]." Britt v. North Carolina, 404 U.S. 226, 227, 92 S.Ct. 431, 433, 30 L.Ed.2d 400 (1971) (emphasis added). The Court has allowed indigents transcripts of their own prior proceedings in some cases [2] yet has indicated that even that right is not absolute.[3] Further, in *Britt*, the Court noted that the outer limits of the right were not clear. 404 U.S. at 227, 92 S.Ct. 431. Shipley's contention—that he has a constitutional right to a free transcript of testimony at a third party's trial by witnesses who would also testify against him—would require a delineation of those outer limits. However, any definition must await another challenge because even if Shipley had the right, any error in its denial was harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

Shipley wanted a transcription of the testimony of Lawson and McAlpine in order to impeach them if they testified at his own trial. He had a transcript of the testimony they gave in the *first*

1. The third witness whose testimony was sought did not ultimately testify against Bamberger and Shipley. Therefore, as to the testimony of this witness, no prejudice is claimed.

2. *See* Williams v. Oklahoma City, 395 U.S. 458, 89 S.Ct. 1818, 23 L.Ed.2d 440 (1969); Gardner v. California, 393 U.S. 367, 89 S.Ct. 580, 21 L.Ed.2d 601 (1969); Roberts v. LaVallee, 389 U.S. 40, 88 S.Ct.

194, 19 L.Ed.2d 41 (1967); Long v. District Court, 385 U.S. 192, 87 S.Ct. 362, 17 L.Ed.2d 290 (1966); Griffin v. Illinois, 351 U.S. 12, 76 S.Ct. 585, 100 L.Ed. 891 (1956).

3. Britt v. North Carolina, 404 U.S. 226, 227, 92 S.Ct. 431, 30 L.Ed.2d 400 (1971); Griffin v. Illinois, *supra* note 2, at 20 of 351 U.S., 76 S.Ct. 585, 100 L.Ed. 891.

Northern trial which he used for that very purpose.

The government's primary eyewitness was McAlpine, not Lawson. McAlpine was the only witness who saw the robbers' faces and made a positive identification.[4] Shipley's attorney effectively cross-examined McAlpine, citing inconsistencies with his statements in an FBI report, with the Los Angeles Police Department report on this robbery and with his testimony in the first Northern trial.[5] Shipley could neither reasonably hope for, nor realistically gain, more telling or damaging impeachment tools from the transcript he was denied.[6] Moreover, there was circumstantial evidence introduced against Shipley which significantly decreased the government's absolute need for the eyewitness testimony.[7]

4. The value of Lawson's testimony was much less. Though he gave a detailed description at this trial, he was impeached by the inadequate description he gave to the FBI on the day of the robbery as well as by his statement that he could not perceive the robbers' race or ethnic origin. Lawson even testified on cross-examination that he could not identify Shipley, merely that he resembled the man he saw coming out of the bank.

5. Shipley's attorney confronted McAlpine with an FBI report which stated:
"McAlpine concluded by advising that due to the distance between himself and the suspects he did not feel that he would be in a position to effect an identification of them at a later date."
McAlpine denied he made that statement. Shipley's attorney then read to the jury a part of McAlpine's testimony from the first Northern trial in which McAlpine testified that he did not remember whether or not he had made the statement to the FBI.

Cross-examination also demonstrated that McAlpine's identification of Shipley was less definite when he saw a photograph earlier and, as reported by the FBI,
"McAlpine stated that although not positive he feels that the identification order photograph of Barry Shipley strongly resembles the individual who was firing at him . . . from the right rear window . . . ."
Shipley's attorney also questioned McAlpine about a Los Angeles police report which stated that the driver of the vehicle was a male Negro who wore a white motorcycle helmet but provided no further description. McAlpine stated that he had positively identified the driver to the reporting officers. The defense rebutted that statement by calling Officer Fuentes, the author of the police report, who testified that he did not recall McAlpine giving him a description.

6. Shipley contends that the value of the transcript of the *second* Northern trial rests on the following testimony:

a) Lawson identified Northern as one of the three men running from the bank. (However, Lawson was not asked that question in this case. McAlpine consistently identified Northern as the driver. Shipley argues that this discrepancy would have discredited both witnesses.)

b) Lawson made the statement that an unnamed laborer was present. (But, there was no showing that this man had anything to offer as a witness.)

c) Lawson testified that he identified Shipley at a photospread and then at a lineup. (In the present case, he did not mention the photospread.)

d) McAlpine mentioned that Officer Shelburn was also at the scene of the robbery. (But Shelburn testified in the second Northern trial and indicated he could not identify the robbers.)

e) There were various unspecified parts of McAlpine's testimony which Shipley claims were in conflict with his testimony in the Bamberger-Shipley trial. (A comparison of his testimony at each trial shows no significant differences. The discrepancies are especially insignificant in view of the impeachment already discussed. *See* note 5, *supra*.)

What little value which might be gained from the second Northern transcript was essentially directed against Lawson, the less valuable and already impeached eyewitness. *See* note 4, *supra*.

7. Shipley and Northern rented the apartment in which they were living in September, 1969. Both men used aliases. Northern gave Bamberger's address as his last address and Shipley gave a former address in Dania, Florida.

Bamberger's apartment was located six or seven blocks from where the abandoned getaway car was found. Shipley and Bamberger were seen at the apartment together.

The Florida residence was searched by the FBI pursuant to a warrant in a separate case. The FBI found a photo-

## II. *The Search Warrant.*

■ A red gun box and pictures were obtained from Shipley's apartment pursuant to a search warrant. He attacks the validity of that warrant. Only Shipley has standing to raise the question since only his room was searched. Alderman v. United States, 394 U.S. 165, 171–72, 89 S.Ct. 961, 22 L.Ed.2d 176 (1969).

■ Shipley trisects the affidavit upon which the warrant was based and systematically finds each section insufficient to support the warrant. His approach is incorrect. "[T]he magistrate is obligated to render a judgment based upon a *common-sense reading* of the *entire affidavit.*" Spinelli v. United States, 393 U.S. 410, 415, 89 S.Ct. 584, 588, 21 L.Ed.2d 637 (1969) (emphasis added). *See* United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed. 2d 684 (1965).

In *Spinelli,* the informant's tip alone was insufficient as a basis for a finding of probable cause. 393 U.S. at 415–16, 89 S.Ct. 584. Further, the tip, even when corroborated by FBI information, was still inadequate. 393 U.S. at 418.

■ The affidavit in this case is a different matter. Although this tip alone, as in *Spinelli,* may be inadequate, the question is whether the tip, when corroborated by other information, is as reliable as one which meets the requirements of Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). *See Spinelli, supra,* 393 U.S. at 415–416, 89 S.Ct. 584.

Here the affidavit recited that Bamberger and Shipley were wanted for a New Jeresy bank robbery involving $69,-531.00; that Bamberger had been arrested that day and that a lawful search of his apartment produced $1,805.00; that Shipley's roommate had observed Shipley with a large amount of cash while in company with Bamberger and while alone in their apartment; that Bamberger had visited that apartment several times during the past month, most recently, the previous night; and that a paid, previously reliable FBI informant had stated that Bamberger and Shipley were holding the shares of four others already arrested for the New Jersey robbery.

Taken together, the tip and the corroboration provide a magistrate with the required information that matter which may be seized lawfully is probably at the place described and that the information supplied by the informant is reliable. The FBI agent's "affidavit should not be judged as an entry in an essay contest." *Spinelli, supra,* 393 U.S. at 438, 89 S.Ct. at 600 (Fortas, J., dissenting). It must be "interpreted . . . in a commonsense and realistic fashion." United States v. Ventresca, *supra,* 380 U.S. at 108, 85 S.Ct. at 746. We hold that this affidavit provided sufficient bases for the magistrate's finding of probable cause.

The other allegations of error are unmeritorious.

Affirmed.

---

graph of Bamberger, Shipley, Euther Presha and a fourth man. Euther Presha was identified by McAlpine as the man riding in the front passenger seat of the getaway car.

Among the other items discovered at the Florida address were three white motorcycle helmets and one .45 caliber Lama automatic pistol. An expert witness linked the .45 caliber cartridges found in the abandoned vehicle to this weapon. A red gun box was found during the search of Shipley's bedroom in Los Angeles. That box had the same serial number as the .45 caliber automatic found in Florida.