**UNITED STATES of America,
Plaintiff—Appellee,**

v.

**Elias Miguel BARRERA–MEDINA, Miguel Hernandez–Munguia, Martin Perez–Estrada, Lino Hernandez, Timoteo Valle, Gabriel Ortiz–Villalobos, Defendants—Appellants.**

**Nos. 03–10455, 03–10457 to 03–10461.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 7, 2004.

Decided July 7, 2005.

Carolyn K. Delaney, John K. Vincent, Esq., Phillip A. Talbert, Esq., Office of the U.S. Attorney, Sacramento, CA, for Plaintiff–Appellee.

Victor S. Haltom, Esq., Bruce Locke, Esq., Tim Warriner, Esq., Law Office of Tim Warriner, Dwight M. Samuel, Esq., Daniel M. Davis, Esq., Sacramento, CA, Suzanne A. Luban, Esq., Law Offices of Suzanne Luban, Oakland, CA, for Defendants–Appellants.

Before: O'SCANNLAIN, COWEN,* and BEA, Circuit Judges.

* The Honorable Robert E. Cowen, Senior United States Circuit Judge for the Third Circuit,

MEMORANDUM **

Defendants–Appellants Elias Miguel Barrera–Medina, Miguel Hernandez–Munguia, Martin Perez–Estrada, Lino Hernandez, Timoteo Valle, Jr., and Gabriel Ortiz–Villalobos appeal their convictions and sentences for various drug and firearm offenses relating primarily to a conspiracy to purchase approximately one million pseudoephedrine pills to manufacture methamphetamine. We have jurisdiction pursuant to 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291, and affirm in part and grant a limited remand in part. Because the parties are familiar with the factual and procedural history, we do not repeat it here except to the extent necessary for our disposition.

I.

Hernandez–Munguia, Perez–Estrada, Timoteo Valle, Jr., and Ortiz–Villalobos (the "Intrepid Defendants") argue that the district court erred in finding that there was probable cause to effect their warrantless arrest and, thus, erred in denying their motion to suppress the evidence seized during the search of the Dodge Intrepid in which they were driving at the time of their arrest. We review *de novo* the district court's legal conclusion that probable cause existed; we review the underlying facts as found by the district court for clear error. *United States v. Hoyos*, 892 F.2d 1387, 1392 (9th Cir.1989), *overruled on other grounds, United States v. Ruiz*, 257 F.3d 1030 (9th Cir.2001).

"The test for probable cause is whether the facts and circumstances within the arresting officer's knowledge are sufficient to warrant a prudent person to believe a suspect has committed, is committing, or is about to commit a crime." *Id.* In making this determination, "[t]he arresting officer need not have personal knowledge of the facts sufficient to constitute probable cause." *Id.* Rather, "[p]robable cause may be based on the collective knowledge of all of the officers involved in the investigation and all of the reasonable inferences that may be drawn therefrom." *Id.* Further, "[t]he experience and expertise of the officers involved in the investigation and arrest may be considered...." *Id.* Finally, the court is to consider the totality of the circumstances. *Id.* at 1393.

■ Here, there were three facts known collectively to the officers involved in the investigation that, given the reasonable inferences that may be drawn and the officers' experience and expertise, combine to support a reasonable belief that the Intrepid Defendants had been involved in the drug buy. *First,* following the May 9, 2002, meeting at which Detective Robles, Manuel Valle and Hernandez negotiated the purchase of the pseudoephedrine pills, officers conducting surveillance followed Manuel Valle and Hernandez to an apartment complex. Manuel Valle and Hernandez parked their Lincoln Navigator two to three parking spaces from a Chrysler Concord and Dodge Intrepid, and then entered the apartment complex. The officers shortly thereafter observed five Hispanic men walking together from one of the apartments, get into the Chrysler Concord and Dodge Intrepid, and leave the apartment complex. Thus, the following day, when both the Lincoln Navigator and the Chrysler Concorde were used by Manuel Valle, Barrera–Medina and Hernandez in effecting the drug buy, the officers had reason to believe that the occupants of the Dodge Intrepid—the Intrepid Defendants—were in some manner acquainted with those who had negotiated and were

sitting by designation.

** This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.

effecting the drug buy. *Second,* given the manner in which the Dodge Intrepid was driven and its location before, during and immediately after the drug buy, the officers had reason to believe that the Intrepid Defendants were engaged in counter-surveillance or security while Manuel Valle and Hernandez were purchasing the pseudoephedrine pills from Detective Robles. *Third,* the manner in which the Dodge Intrepid followed the Lincoln Navigator and the Chrysler Concorde after the drug buy provided further reason to believe that the Intrepid Defendants were participants in the drug buy.

In response to this evidence, the Intrepid Defendants raise two arguments, neither of which we find persuasive. *First,* they argue that the probable cause was based solely on their presence near the drug buy and that mere presence does not give rise to probable cause. *See Ybarra v. Illinois,* 444 U.S. 85, 91, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979) ("[A] person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person."); *United States v. Di Re,* 332 U.S. 581, 587, 68 S.Ct. 222, 92 L.Ed. 210 (1948) (same). To begin, it is simply not the case, as explained above, that the only evidence in support of the probable cause determination was the Intrepid Defendants' "mere propinquity," *Ybarra,* 444 U.S. at 91, to the other defendants. Further, " '[c]onduct which appears innocent to a lay person may have an entirely different significance to an experienced narcotics officer.' " *Hoyos,* 892 F.2d at 1393 (quoting *United States v. Hicks,* 752 F.2d 379, 384 (9th Cir.1985)). In determining whether probable cause existed at the time of an arrest, "[t]he experience and expertise of the officers involved in the investigation and arrest made be considered" by the court. *Id.* at 1392. It is thus significant that Detective Madison testified at the probable cause hearing

that it is common for those involved in drug transactions to have associates provide either counter-surveillance or security and that, based on his training and experience, he believed that the occupants of the Dodge Intrepid were so involved in the drug buy here.

*Second,* the Intrepid Defendants argue that there was evidence suggesting that they neither engaged in counter-surveillance nor otherwise facilitated the crime. But the fact that the Dodge Intrepid may not have been conducting counter-surveillance during the initial meet between Detective Robles, Manuel Valle and Hernandez—during which there were no drugs in large quantity and thus less need for counter-surveillance or security—is not conclusive. The Intrepid Defendants may have decided not to engage in such activity so as not to attract attention before the drugs-for-money transaction—the precise time when counter-surveillance and security were most needed. Further, the fact that the Dodge Intrepid was not observed at all times prior to and during the drug buy does not establish that it was not somewhere in the area. Nor does the fact that the Dodge Intrepid had at one point parked where the occupants would not have been able to see the drug buy mean that the occupants were not involved. Indeed, Detective Madison testified that counter-surveillants typically park somewhere where they can see the transaction *or get to the transaction quickly* to provide security. Although there were two parking lots where the Dodge Intrepid might have parked and that would have afforded a view of the drug buy, both were empty at the time of the transaction. Thus, according to Detective Madison, parking in either of them would have drawn suspicion to the Dodge Intrepid. Finally, the fact that, after the officers signaled with their sirens, the Dodge Intrepid stopped before the Lincoln Navigator is no surprise—the

Lincoln Navigator was loaded with one million pseudoephedrine pills.

Thus, the warrantless arrest was supported by probable cause, and the district court did not err in denying the Intrepid Defendants' motion to suppress.

## II.

The Intrepid Defendants argue that the district court erred in denying their motion for judgment of acquittal as to Counts 1, 2, 3 and 5. "When, as in this case, a claim of sufficiency of the evidence is preserved by making a motion for acquittal at the close of the evidence, this court reviews the district court's denial of the motion de novo." *United States v. Carranza*, 289 F.3d 634, 641–42 (9th Cir.2002). Further, "[a] challenge to the sufficiency of the evidence requires this court to determine if 'after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original)).

## A.

■ Counts 1 and 2 charged the Intrepid Defendants, respectively, with conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 846, 841(a)(1) and with conspiracy to possess a listed chemical with knowledge, or having reasonable cause to believe, that it would be used to manufacture methamphetamine in violation of 21 U.S.C. §§ 846, 841(c)(2). Where the Government proves the existence of a conspiracy, it need only prove a "slight" connection between the conspiracy and the defendants to convict the defendants of conspiracy. *United States v. Aichele*, 941 F.2d 761, 763 (9th Cir.1991). The term "connection" in this context—"slight" or otherwise—means intentional participation in the conspiracy. *United States v. Herr-*

*era–Gonzalez*, 263 F.3d 1092, 1097–98 (9th Cir.2001). The modifier "slight" means that "a defendant need not have known all the conspirators, participated in the conspiracy from its beginning, participated in all its enterprises, or known all its details." *Id.* at 1095.

Here, the Intrepid Defendants concede that the Government proved a conspiracy among Manuel Valle, Barrera–Medina and Hernandez. Thus, the Government was required to prove only that the Intrepid Defendants intentionally participated in the conspiracy, even if only in a "slight" way. Viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found beyond a reasonable doubt that the Intrepid Defendants did so. The jury could have determined that the Intrepid Defendants were not merely present at the scene of the drug buy and that their conduct was not as consistent with being innocent bystanders as it was with guilt.

To begin, the Government introduced at trial substantially the same evidence as discussed in Part I above tending to show that the Intrepid Defendants were conducting counter-surveillance or security in connection with the drug buy. The Government also introduced at trial evidence that the defendants used cell phones to make at least sixteen calls amongst themselves in the less than four hours spanning the period before, during and after the drug buy, further suggesting that the Intrepid Defendants were conducting counter-surveillance or security on behalf of Manuel Valle, Barrera–Medina and Hernandez. Finally, the Government introduced into evidence a number of items found in the Dodge Intrepid that a rational trier of fact could have found to be instrumentalities of the crime: a handgun, a semi-automatic pistol, the same type of plastic wrap that had been used to wrap

the money that Manuel Valle had used to purchase the pseudoephedrine pills from Detective Robles, and a Day Planner that included a business card for the motel where the drug buy had occurred.[1]

Thus, the district court did not err in denying the Intrepid Defendants' motion for judgment of acquittal as to Counts 1 and 2.

## B.

The Intrepid Defendants argue that to the extent the Government's evidence is insufficient to support their conspiracy convictions on Counts 1 and 2 and because there is no evidence that they handled, transported, or otherwise had dominion or control over the drugs, the Government's evidence is insufficient to support their

1. The Intrepid Defendants cite a number of cases in support of their position that the evidence was insufficient, but each is distinguishable. *See United States v. Estrada–Macias*, 218 F.3d 1064, 1066–67 (9th Cir.2000) (vacating the defendant's conviction for conspiracy to manufacture methamphetamine because "[t]he record is barren of evidence that [the defendant] *participated* in the conspiracy") (emphasis in original); *United States v. Ramos–Rascon*, 8 F.3d 704, 706–08 (9th Cir. 1993) (vacating the defendants' convictions for conspiracy to distribute cocaine in part because the Government's theory that the defendants were engaged in counter-surveillance "is substantially undermined" because neither of the defendants "possessed any weapon ... or any form of communication such as a ... mobile phone" and because the defendants merely tailgated the other conspirators); *United States v. Sanchez–Mata*, 925 F.2d 1166, 1167–68 (9th Cir.1991) (vacating the defendant's conviction for conspiracy to possess with intent to distribute narcotics where the only evidence introduced that might have implicated the defendant in the conspiracy was that he was the passenger in a car, the trunk of which was loaded with marijuana, and that, throughout the roadside stop by Border Patrol Agents, he looked nervous and made eye contact with another member of the conspiracy); *United States v. Penagos*, 823 F.2d 346, 347, 349, 350 n. 4 (9th Cir. 1987) (vacating the defendant's conviction for

convictions on Counts 3 and 5. Because we hold that there was sufficient evidence on which to convict the Intrepid Defendants on Counts 1 and 2, this argument fails.

## III.

The Intrepid Defendants, Barrera–Medina and Hernandez argue that the district court abused its discretion by admitting expert testimony from Sergeant Risedorph regarding counter-surveillance and use of weapons by drug traffickers. They argue both that the district court failed in its "gatekeeping" duty under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597–98, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and that the expert testimony should have been excluded pursuant to Federal Rule of Evidence 403.

conspiracy to possess with intent to distribute narcotics and, in so doing, noting as "crucial," among other things, that the "defendant's alleged counter-surveillance activities did not occur at times or places where the risk of detection and capture is greatest, i.e. at meetings between buyers and sellers and during actual transfer of drugs to buyers," and discounting the evidence of the defendant making and receiving calls at public telephones because the Government did not trace any of the calls and were unable to determine who wore the pagers to which the calls went); *United States v. Lopez*, 625 F.2d 889, 890, 896 (9th Cir.1980) (vacating the defendant's conviction for conspiracy to possess with intent to distribute heroin where the defendant was merely a passenger in the car transporting the drugs and the Government appears not to have advanced a theory that the defendant was engaged in counter-surveillance); *United States v. Cloughessy*, 572 F.2d 190, 190–91 (9th Cir.1977) (vacating the defendant's conviction for conspiracy in violation of 21 U.S.C. §§ 846, 841(a)(1), relying in large part on the fact that "[h]is codefendants testified that [the defendant] was not a party to the conspiracy and that he did not participate in any of the negotiations or discussions with the conspirators" and that there was evidence corroborating the codefendants' testimony).

## A.

When a party properly preserves an objection to the admission of expert testimony, we review the district court's decision to admit the testimony for abuse of discretion. *United States v. Gonzales,* 307 F.3d 906, 909 (9th Cir.2002).[2] A district court abuses its discretion when it makes an error of law. *Koon v. United States,* 518 U.S. 81, 100, 116 S.Ct. 2035, 135 L.Ed.2d 392 (1996).

District courts have a "gatekeeping" duty to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert,* 509 U.S. at 589, 598–98; *see also Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (holding that this "general 'gatekeeping' obligation ... applies not only to testimony based on 'scientific' knowledge, but also to testimony based on 'technical' and 'other specialized' knowledge"). Part and parcel of the gatekeeping function and the *Daubert* hearing through which district courts fulfill that function is an explicit reliability determination on the record. *Mukhtar v. California State University,* 299 F.3d 1053, 1064–67 (9th Cir.2002), *amended by* 319 F.3d 1073 (9th Cir.2003).

Here, the district court failed to make the required finding. The Intrepid Defendants filed a motion *in limine* before the district court in which they objected to Sergeant Risedorph's testimony as to counter-surveillance on four distinct grounds: (1) that the testimony of Sergeant Risedorph "will not assist the jurors to understand the evidence or to determine a fact in issue"; (2) "that Sergeant Risedorph is not qualified"; (3) that "the other requirements of Rule 702 [pertaining to reliability] must be demonstrated"; and

(4) that "Sergeant Risedorph's opinion testimony should also be excluded pursuant to Rule 403." CR 73 at 6–7. Significantly, although the first three grounds are related, they nonetheless are distinct inquiries. *See* Fed.R.Evid. 702; *Daubert,* 509 U.S. at 591 (holding that the requirement that the expert testimony " 'assist the trier of fact' ... goes primarily to relevance" rather than reliability); *Mukhtar,* 299 F.3d at 1066 n. 11 (noting that whether an expert is qualified also is distinct from the question of reliability). But at the hearing on the motion *in limine,* the district court focused exclusively on whether Sergeant Risedorph's proposed testimony as to counter-surveillance would have been "beneficial to the trier of fact" and whether Sergeant Risedorph was or might later be deemed an expert. The district court made no mention of whether the methodology he employed was reliable. Nor did the district court later make any reliability determination on the record.

Nevertheless, where a district court fails to comply with its gatekeeping duty, the verdict is reversible only if the appellant can demonstrate that the improperly admitted expert testimony was "not harmless." *Mukhtar,* 299 F.3d at 1066. Improperly admitted evidence is "not harmless" if it "more probably than not was the cause of the result reached." *Id.* Here, we cannot say that Sergeant Risedorph's testimony on counter-surveillance and the use of firearms by counter-surveillants "more probably than not was the cause of the result reached." *Id.*

*First,* the relevance of counter-surveillance goes to whether there was sufficient evidence to support the Intrepid Defendants' convictions for conspiracy, and, as

---

**2.** The Government contends that the defendants did not properly preserve the issue and that we should therefore review for plain error. Fed.R.Evid. 103(d). Because the stan-

dard of review does not affect the outcome of this issue, we assume that the more lenient of the two standards of review applies.

explained in Part II above, there was, even without Sergeant Risedorph's testimony.

*Second,* even without Sergeant Risedorph's testimony, the jurors likely understood that large drug transactions would involve counter-surveillance and armed protectors and that such counter-surveillants likely would be in the area of the drug transaction, perhaps in a car, perhaps communicating with one another and those more centrally involved in the drug transaction, and perhaps armed. As the defendants themselves argued in their motion *in limine:* "An untrained layman would be qualified to intelligently determine whether the evidence points to the defendants' involvement in the conspiracy and firearm offense." CR 73 at 6–7.

*Third,* even if the jurors did not have an intuitive understanding of counter-surveillance, the defendants themselves elicited testimony on cross-examination from the officers engaged in surveillance. Such testimony, even in the absence of Sergeant Risedorph's testimony, would have alerted the jurors to the notion of counter-surveillance and to methods of driving characteristic of counter-surveillance and consistent with the movement of the Dodge Intrepid during the drug buy. *See, e.g.,* 5/7/03 RT at 804 ("Q. It's hard to do counter-surveillance driving in a straight line on a highway; would that be right? A. Yes. Well, there's no other choice because it's a freeway, so you don't have any side streets or intersections or parking lots or things that you would typically use for counter-surveillance."). Likewise, the jury heard testimony that the officers involved in surveillance communicated with one another throughout the drug buy, and could have inferred from this testimony alone that evidence of frequent communication among people positioned near and around a drug transaction suggests that they are involved in surveillance.

### B.

Although we review a district court's decision to admit expert testimony over an objection on the basis of Federal Rule of Evidence 403 for abuse of discretion, any error is subject to harmless error review. *United States v. Vallejo,* 237 F.3d 1008, 1017 (9th Cir.), *amended by* 246 F.3d 1150 (9th Cir.2001). As discussed in Part III.A above, the admission of Sergeant Risedorph's testimony was harmless.

### IV.

The Intrepid Defendants argue that the admission into evidence of post-arrest confessions made by non-testifying co-defendants Barrera–Medina and Hernandez, even as redacted, and Detective Roble's testimony regarding these confessions, violated their Sixth Amendment Confrontation Clause rights under *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). We review alleged violations of the Confrontation Clause *de novo. United States v. Peterson,* 140 F.3d 819, 821 (9th Cir.1998).

In *Bruton,* the Supreme Court held that a defendant was deprived of his rights under the Confrontation Clause when his non-testifying co-defendant's confession inculpating the defendant by name was admitted at their joint trial, even though the trial court made a limiting instruction to the jury to consider the confession as to only the co-defendant's guilt. *Bruton,* 391 U.S. at 124–26. Following *Bruton,* however, the Supreme Court held "that the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when ... the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). This is so even if a non-testifying co-defen-

dant's confession that is "not incriminating on its face" is "linked" to the defendant with other evidence introduced at trial. *Id.* at 208.

Here, neither of the confessions as redacted nor Detective Robles's testimony reference any of the Intrepid Defendants by name nor make reference to their existence. Rather, the logical interpretation of the pronouns "we," "our" and "they" as used in the confessions and in Detective Robles's testimony is that they referred to Manuel Valle and either Barrera–Medina or Hernandez or both, but not to any of the Intrepid Defendants. Indeed, the fact that both Barrera–Medina and Hernandez confessed and that these confessions were read one after the other may have led the jury, if anything, to believe that only Manuel Valle, Barrera–Medina and Hernandez were involved. Thus, the admission of the confessions as redacted and Detective Robles's testimony, in combination with the district court's limiting instruction, did not violate the Confrontation Clause rights of the Intrepid Defendants.

The Intrepid Defendants make four arguments to the contrary, none of which we find persuasive. *First*, they rely on *Gray v. Maryland*, 523 U.S. 185, 118 S.Ct. 1151, 140 L.Ed.2d 294 (1998), where the Supreme Court held that a "redaction that replaces a defendant's name with an obvious indication of deletion, such as a blank space, the word 'deleted,' or a similar symbol ... falls within *Bruton*'s protective rule." *Id.* at 192. Although *Gray*'s holding does not apply here—because the redactions here are not obvious—the Intrepid Defendants argue that the Supreme Court's "reasoning must apply equally where the confessions point to or appear to identify the defendants by a neutral pronoun, as in the present case...." Def. Br. at 73 (Nos.03–10457+). This argument fails not only because the confessions here do not "point to or appear to identify" any

of the Intrepid Defendants, but also because it is foreclosed by *Richardson.* There, two of three alleged assailants were tried jointly. *Richardson,* 481 U.S. at 202. The co-defendant's confession was redacted so as to omit any reference to the defendant, but used the pronoun "we" in apparent reference to the co-defendant and third assailant while they were driving to the robbery. *Id.* at 204 n. 1. The confessions here are no different.

*Second,* the Intrepid Defendants argue that the trial evidence, the Government's theory of the case, and the Government's argument to the jury "compounded the incriminating impact of the statements." Def. Br. at 74–75 (Nos.03–10457+). This argument also is foreclosed by *Richardson.* There, evidence was introduced at trial placing the defendant in the car with the co-defendant and third assailant on the way to the robbery, which was the subject of the co-defendant's confession wherein the pronoun "we" was used. *Richardson,* 481 U.S. at 208. Nevertheless, the Supreme Court held that the mere fact that the defendant is "linked" to the confession by other evidence introduced at trial does not render the admission of the confession a violation of the Confrontation Clause. *Id.*

*Third,* the Intrepid Defendants argue that even if one logical interpretation of the pronouns used in the redacted confessions is that they referred to Manuel Valle and either Barrera–Medina or Hernandez or both, they "were *just as* susceptible to the interpretation the defense lawyers worried about—that 'we' included the Intrepid appellants." Def. Br. at 76 (Nos.03–10457+) (emphasis added). This is simply not correct; the "we" was in reference to the planned robbery in the motel, in which none of the Intrepid Defendants participated. In any event, this argument is foreclosed by *Richardson,* where the interpretation of "we" was no

less susceptible of including the defendant there.

*Fourth,* the Intrepid Defendants argue that because there were two confessions and each referenced Manuel Valle by name and used the pronouns "we" and "our," the confessions must have referred to more than just Manuel Valle and the speaker. Def. Br. at 76 (Nos.03–10457+). Even if this is correct, it would be entirely consistent to interpret the "we" and "our" as referring only to Manuel Valle, Hernandez and Barrera–Medina.

Accordingly, the district court did not err in admitting the redacted confessions of Barrera–Medina and Hernandez.

## V.

■ Barrera–Medina and Hernandez argue that the district court abused its discretion by ordering that they each have one ankle linked by airplane cable to cement-filled buckets located beneath counsel's table during trial. We review a district court's decision to "shackle"[3] a defendant during trial or sentencing for an abuse of discretion. *United States v. Collins,* 109 F.3d 1413, 1417 (9th Cir. 1997). Even if the district court does abuse its discretion, unconstitutional

shackling typically "is susceptible of harmless error analysis." *Castillo v. Stainer,* 983 F.2d 145, 148 (9th Cir.1992), *amended by* 997 F.2d 669 (9th Cir.1993); *see Deck v. Missouri,* —— U.S. ——, 125 S.Ct. 2007, 2015–16, 161 L.Ed.2d 953 (2005).[4]

Before ordering defendants shackled during the guilt phase of a trial, "the trial court 'must be persuaded by compelling circumstances' that some measures were needed to maintain security," and "[t]hen, the court must 'pursue less restrictive alternatives before it imposes physical restraints.'" *Castillo,* 983 F.2d at 147 (quoting *Jones v. Meyer,* 899 F.2d 883, 885 (9th Cir.1990)); *see Deck,* 125 S.Ct. at 2012–14. Here, the district court's reasons for shackling the defendants were: (1) that the "defendants were either in possession of or clearly associated with a number of firearms when they were stopped"; (2) that "at least two of the defendants ha[d] indicated in statements to law enforcement that there was intention to rob an individual"; and (3) that "at least one of the defendants ha[d] refused the direct orders of the Deputy United States Marshal with respect to being dressed out in his courtroom clothing." 4/30/03 RT at 3–4; *accord* 4/29/03 RT at 5.[5] On these facts, the dis-

---

**3.** To the extent the term "shackle" implies the use of handcuffs and metal chains, it is misleading on the facts of this case. Nevertheless, the case law uses the term to refer to any restraint.

**4.** We note that, in the habeas context, a district court's abuse of discretion in shackling a defendant is not harmless if the shackling " 'had substantial and injurious effect or influence in determining the jury's verdict.' " *Castillo,* 997 F.2d at 669 (quoting *Brecht v. Abrahamson,* 507 U.S. 619, 623, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (quoting *Kotteakos v. United States,* 328 U.S. 750, 776, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946))); *accord Williams v. Woodford,* 384 F.3d 567, 591 (9th Cir.2004). On direct appeal, however, "[t]he State must prove 'beyond a reasonable doubt

that the [shackling] error complained of did not contribute to the verdict obtained.' " *See Deck,* 125 S.Ct. at 2015–16 (quoting *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967); Fed.R.Crim.P. 52(a)); *Brecht,* 507 U.S. at 623 (holding that "[t]he *Kotteakos* harmless-error standard is better tailored to the nature and purpose of collateral review than the *Chapman* standard").

**5.** The Government argues that the district court also relied on the fact that there would be six defendants present in the courtroom and that this was inherently dangerous. The district court referenced the number of defendants in the context of shackling at two different hearings. At the first hearing, it is not clear whether the district court relied on the number of defendants as justification for add-

trict court abused its discretion in ordering the shackling. *See, e.g., Gonzalez v. Pliler,* 341 F.3d 897, 902 (9th Cir.2003).

■ However, the error was harmless beyond a reasonable doubt. To begin, the record strongly suggests that the jury was not able to see or hear any of the defendants' shackles and that their shackles did not impair them in any material way. Further, Barrera–Medina and Hernandez make no showing at all that they suffered any prejudice and adduce no juror affidavits or other evidence that jurors saw or heard the restraints. Rather, Barrera–Medina and Hernandez make two arguments, neither of which is persuasive.

*First,* they argue that they do not bear the burden of proving that the error was harmless beyond a reasonable doubt. In this, they are correct. *See Deck,* 125 S.Ct. at 2015–16; *cf. Duckett v. Godinez,* 67 F.3d 734, 749 (9th Cir.1995) ("The risk of doubt ... is on the state."). But the record admits of little doubt that Barrera–Medina and Hernandez were not prejudiced. Absent countervailing evidence, the Government has satisfied its burden. Nor does *Duckett,* on which Hernandez and Barrera–Medina principally rely, hold otherwise. There, the defendant was forced to wear shackles before his sentencing jury. *Id.* at 738. We held that the state trial court failed to comply with our precedent in ordering that the defendant be shackled and therefore remanded to the district court to conduct an evidentiary hearing to determine whether the error was harmless. *Id.* at 738, 748–49. In doing so, we noted that although the defendant had not presented any evidence of prejudice, "[t]he risk of doubt ... is on the state." *Id.* at 749. However, central to our decision to remand was the fact that

"the record does not reflect how onerous the shackles were, or the extent to which they were visible to the jury." *Id.* This is quite unlike the situation here. Nor is it enough to say, as Barrera–Medina and Hernandez do, that shackling is inherently prejudicial and, thus, that they need not produce any evidence that the prejudice was harmful. *Id.* ("Shackling, except in extreme forms, is susceptible to harmless error analysis."); *see Deck,* 125 S.Ct. at 2015–16 (noting in the same paragraph that "shackling is 'inherently prejudicial,'" but that harmless-error analysis is appropriate).

*Second,* although conceding that "improper resort to physical restraints is a type of constitutional violation which typically is subject to harmless error review," Barrera–Medina and Hernandez nevertheless argue that harmless error review is not here appropriate because the district court's order was "utterly lawless." Def. Br. at 18 (Nos.03–10455+). Hernandez and Barrera–Medina therefore invite this court to invoke its "supervisory power" to reverse their convictions "without regard to any prejudice inquiry" and, thereby, "advance judicial integrity" and "deter future unconstitutional shackling orders." Def. Br. at 19 (Nos.03–10455+).

We decline to do so. Barrera–Medina and Hernandez rely on *United States v. Hasting,* 461 U.S. 499, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983), but the Supreme Court there held:

> Supervisory power to reverse a conviction is not needed as a remedy when the error to which it is addressed is harmless since, by definition, the conviction would have been obtained notwithstanding the asserted error. Further, in this

---

ed security or, rather, referred to the number of defendants only to explain that the corresponding number of marshals might in and of itself prejudice the defendants. At the second

and final hearing on the issue of shackling, it is clear that the district court did not rely on the number of defendants as justification for added security.

context, the integrity of the process carries less weight, for it is the essence of the harmless error doctrine that a judgment may stand only when there is no "reasonable possibility that the [practice] complained of might have contributed to the conviction."

*Id.* at 506 (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)) (alteration in original). Further, after first concluding "that the trial court did not comply with the criteria laid down by this circuit" in ordering that the defendant there be shackled during trial, the court in *Castillo* nevertheless conducted a harmless error analysis. *Castillo,* 983 F.2d at 147. Likewise, in *Duckett,* we held that "the state trial court did not abide by either criteria" required for shackling defendants and, indeed, "summarily overruled Duckett's objection to the shackles." *Duckett,* 67 F.3d at 748. Further, we noted that "the record does not indicate any compelling reason for shackling Duckett during his sentencing hearing," *id.* at 747, and that "[t]here is no indication in the record that the court considered whether any less restrictive alternatives were available and would be adequate." *Id.* at 748. Nevertheless, we remanded the case to the district court to determine whether the error was harmless. *Id.* at 749.

Accordingly, although the district court did abuse its discretion in ordering that Barrera–Medina and Hernandez be shackled, that error was harmless beyond a reasonable doubt.

## VI.

Hernandez argues that the district court erred in denying his motion for judgment of acquittal as to Count 6, which charged Hernandez with distribution of cocaine in violation of 21 U.S.C. § 841(a)(1). He argues that the evidence "is clear" that he did not possess the cocaine supplied to Detective Robles and that there is no evidence that he had sufficient knowledge of the cocaine nor that he facilitated the distribution of the cocaine such that he could be convicted as an aider-and-abettor. Def. Br. at 41–43 (Nos.03–10455+).

■ Viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found beyond a reasonable doubt that Hernandez knew that Manuel Valle was planning on bringing cocaine to the May 9, 2002, meeting and giving Detective Robles a sample. After Manuel Valle told Detective Robles that he had "something" for him and before Manuel Valle took the cocaine out of his pocket in the bathroom where he and Detective Robles were alone, Hernandez admonished Detective Robles "don't use it all at once," suggesting that he knew what it was that Manuel Valle was about to give to Detective Robles. 5/1/03 RT at 346. Likewise, viewing the evidence in the light most favorable to the Government, a rational trier of fact could have found beyond a reasonable doubt that Hernandez "knowingly and intentionally aided, counseled, commanded, induced, or procured," *United States v. Cordova Barajas,* 360 F.3d 1037, 1041 (9th Cir.2004), Manuel Valle to distribute the cocaine. Because the jury could have found beyond a reasonable doubt that Hernandez knew that Manuel Valle was planning on giving Detective Robles a sample of cocaine at the May 9, 2002, meeting, any evidence that the cocaine and pseudoephedrine transactions were related and that Hernandez facilitated the pseudoephedrine transaction during the May 9, 2002, meeting would provide a sufficient basis on which to affirm the conviction. The evidence clearly supports a finding by the jury that the cocaine and pseudoephedrine transactions were related. After Manuel Valle volunteered to Detective Robles that he had cocaine to sell, Detective Robles ordered two kilo-

grams in exchange for some of the pseudoephedrine pills. And Hernandez facilitated the pseudoephedrine transaction at the meeting; specifically, Hernandez bit into a sample pseudoephedrine pill apparently to test it, and quizzed Detective Robles about the pills.

Accordingly, the district court did not err in denying Hernandez's motion for judgment of acquittal as to Count 6.

## VII.

■ Barrera–Medina and Hernandez argue that the district court erred in denying their motion for judgment of acquittal as to Count 1. They contend that the evidence was insufficient to support the jury's special finding that they each conspired to manufacture 50 grams or more of methamphetamine and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine. We disagree that the evidence admitted at trial was insufficient to support the jury's finding.

*First,* Sergeant Risedorph [6] testified at trial that there were five buckets of pills used in the drug buy, and each bucket contained about 80,000 pills. The pills in the five buckets came from "hundreds of pill bottles that were marked pseudo ephedrine [sic]"; these pill bottles were the "original container[s] with a locking top and cellophane tape around them." 5/2/03 RT at 533. Additionally, there were "20–some–odd" boxes of pseudoephedrine pills used in the drug buy, and each box contained about 32,000 pills. 5/2/03 RT at 534. Thus, in total there were in excess of one million pills used in the drug buy that the jury could have found were pseudoephedrine pills. *Second,* Sergeant Risedorph testified that according to the label on the containers, each pseudoephedrine pill used in the drug buy contained 60 milligrams of pseudoephedrine. Thus, the drug buy involved in excess of 60 kilograms of pseudoephedrine. *Third,* although Sergeant Risedorph conceded on cross-examination that depending on the manufacturing process pseudoephedrine could yield no methamphetamine at all, and that he could not estimate the yield in any particular case without knowing the quality of the chemicals used to manufacture the methamphetamine and the proficiency of the people doing so, he also testified, without objection, that "[i]n the street, we typically see the better chemists getting about [an] 80 percent yield." 5/2/03 RT at 489, 502–03. The methamphetamine produced from 60 kilograms of pseudoephedrine would equal 500 grams with a yield of less than one percent.

Thus, after viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found beyond a reasonable doubt that the pills used in the drug buy had sufficient pseudoephedrine to manufacture at least 50 grams of methamphetamine and 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine.

## VIII.

### A.

■ The Intrepid Defendants argue that, to the extent the district court en-

---

**6.** Although the defendants argue on appeal that the district court erred in admitting the expert testimony of Sergeant Risedorph as to whether the Intrepid Defendants were acting as though they were engaged in counter-surveillance, the defendants do not challenge Sergeant Risedorph's testimony as to the manufacturing of methamphetamine and the use of pseudoephedrine pills to do so. *Cf. United States v. Blaine County,* 363 F.3d 897, 915 (9th Cir.2004) (conducting harmless error analysis and, in doing so, considering unchallenged testimony from the expert witness whose testimony was improperly admitted).

hanced their sentence under the then mandatory Sentencing Guidelines on the basis of factual findings made by the district court, it was in violation of *United States v. Booker*, ⸺ U.S. ⸺, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005).[7] However, *"Booker* does not bear on mandatory minimums," *United States v. Cardenas,* 405 F.3d 1046, 1048 (9th Cir.2005), and, with respect to the sentences the Intrepid Defendants challenge on appeal,[8] the district court imposed the minimum sentence that it could on the basis of the facts reflected in the jury verdict.[9] Thus, each of the Intrepid Defendants was convicted of conspiracy to manufacture methamphetamine in violation of 21 U.S.C. §§ 841(a)(1), 846, and the jury returned a special verdict finding that each conspired to manufacture 50 grams or more of methamphetamine and conspired to manufacture 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine. The statutory minimum sentence under these circumstances is ten years, 21 U.S.C. § 841(b)(1)(A)(viii), which is exactly the length of the sentences the Intrepid Defendants challenge on appeal.[10]

In response, the Intrepid Defendants argue that the jury's finding is inadequate because it does not find the quantity of drugs foreseeable to each of the defendants and that fell within the scope of each defendant's agreement with his co-conspirators. However, to the extent these findings are necessary, they are subsumed within the jury's finding that the Intrepid Defendants *each* conspired to manufacture 50 grams or more of methamphetamine and *each* conspired to manufacture 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine.

**B.**

The Intrepid Defendants also argue that the district court failed to sentence them on the basis of only the quantity of drugs foreseeable to each of them. *See* U.S.S.G. § 1B1.3(a)(1)(B). However, sentencing courts must adhere to statutory minimum sentences even when the Sentencing Guidelines dictate a shorter sentence under the circumstances. *United States v. Williams,* 939 F.2d 721, 726 (9th Cir.1991) (holding that "where preexisting sentencing statutes mandate minimum terms in

---

7. Because this appeal was briefed and submitted before the Supreme Court issued its opinion in *Booker,* the defendants argued on the basis of *Blakely v. Washington,* 542 U.S. 296, 124 S.Ct. 2531, 159 L.Ed.2d 403 (2004), as applied to the Sentencing Guidelines by *United States v. Ameline,* 376 F.3d 967 (9th Cir.2004), *amended and superseded by* 409 F.3d 1073 (9th Cir.2005). Because the Supreme Court explained the application of *Blakely* to the Sentencing Guidelines in *Booker,* we construe the defendants' argument as asserting *Booker* error.

8. The Intrepid Defendants were each convicted of three counts unrelated to firearms (Counts 1, 2 and 3). They were each sentenced to a ten-year prison term for these three counts, and it is this sentence that they challenge. They were also each convicted of a firearms offense (Count 5) and were each

sentenced to an additional five-year prison term for this conviction. They do not challenge this latter sentence.

9. Indeed, the Intrepid Defendants "concede that the [*Booker*] error as to the drug quantity determination may be harmless if this Court finds … that there was sufficient evidence to support the jury's special verdict as to the mandatory minimum quantity." Def. Supp. Br. at 13–14 n. 4 (Nos.03–10457+).

10. Because we hold that the district court imposed the statutory minimum sentence, we need not remand in light of *Booker'*s alternative holding that the Sentencing Guidelines are discretionary. *Booker,* 125 S.Ct. at 769 (holding that "reviewing courts [are] to apply ordinary prudential doctrines" including "the harmless-error doctrine").

excess of the maximum applicable Guidelines sentence, these statutes control"); *see also* U.S.S.G. § 5G1.1(c)(2) ("[T]he sentence may be imposed at any point within the applicable guideline range, provided that the sentence ... is not less than any statutorily required minimum sentence."). Here, as explained above in Part VIII.A, the district court imposed the minimum sentence that it could on the basis of the facts reflected in the jury verdict. Thus, whatever error might have occurred is harmless. *See United States v. Fuentes,* 925 F.2d 1191, 1192–93 (9th Cir.1991) (applying harmless error analysis in affirming the defendant's ten-year sentence for conspiracy to possess methamphetamine with intent to distribute).

### C.

Finally, the Intrepid Defendants argue that the district court's findings regarding the quantity of pseudoephedrine actually involved in the drug buy were clearly erroneous. However, for the reasons explained above in Part VIII.B, whatever error might have occurred is harmless.

### IX.

### A.

Barrera–Medina and Hernandez also argue that their sentences were imposed in violation of *Booker,* but they stand in a different light than do the Intrepid Defendants because neither Barrera–Medina nor Hernandez was sentenced to the minimum ten-year sentence pursuant to 21 U.S.C. § 841(b)(1)(A)(viii). Rather, Barrera–Medina was sentenced to a prison term of 235 months (19 years and 7 months) for Counts 1, 2 and 3, and Hernandez was sentenced to a prison term of 292 months (24 years and 4 months) for Count 1.[11] Thus, the jury's finding that they each

conspired to manufacture 50 grams or more of methamphetamine and conspired to manufacture 500 grams or more of a mixture and substance containing a detectable amount of methamphetamine, does not itself provide a basis on which they could have been sentenced as they were.

■ Because they did not raise this objection at sentencing, we review for plain error. *Booker,* 125 S.Ct. at 769. Although we conclude that there was error and that this error was plain, because the record does not evince whether the district court would have imposed a materially different sentence under the now advisory Sentencing Guidelines rather than the mandatory Sentencing Guidelines in effect at the time Barrera–Medina and Hernandez were sentenced, we cannot say whether the error affected their substantial rights. *See United States v. Ameline,* 409 F.3d 1073, 1074 (9th Cir.2005). Accordingly, "a limited remand to the district court is appropriate for the purpose of ascertaining whether the sentence imposed would have been materially different had the district court known that the sentencing guidelines were advisory." *Id.*

### B.

Barrera–Medina and Hernandez also argue that the district court erred in imposing their sentences in several further ways. Although the Sentencing Guidelines are no longer mandatory, district courts must nonetheless "at least consider the available sentence under the now-discretionary federal Guidelines" and, in so doing, must "begin ... with the proper interpretation of the Guidelines." *United States v. Moreno–Hernandez,* 397 F.3d 1248, 1256 n. 10 (9th Cir.2005). Thus, we must reach these further arguments regardless of the district court's conclusion

---

**11.** Although Barrera–Medina and Hernandez was each sentenced for other counts as well, it is Count 1 that carries with it the statutory minimum ten-year sentence.

as to whether it would have imposed materially different sentences under the now advisory Sentencing Guidelines.

### 1.

Pursuant to U.S.S.G. § 1B1.3(a)(1)(B), a defendant convicted of conspiracy is to be sentenced on the basis of the quantity of drugs reasonably foreseeable to that defendant rather than on the basis of the quantity of drugs involved in the conspiracy as a whole. Barrera–Medina and Hernandez argue that the district court failed to do so. Assuming without deciding that the district court did fail to make the required finding as to Barrera–Medina and Hernandez, any such error was harmless because the full quantity of pseudoephedrine involved in the drug buy was reasonably foreseeable to both Barrera–Medina and Hernandez. Barrera–Medina drove the Lincoln Navigator laden with pseudoephedrine after the drug buy. Hernandez was present at the May 9, 2002 meeting, during which Detective Robles and Manuel Valle arranged the drug buy and discussed the quantity of pseudoephedrine to be bought.

### 2.

Barrera–Medina and Hernandez also argue that the district court clearly erred in finding by a preponderance of the evidence that the drug buy involved more than 3 kilograms of pseudoephedrine and that this pseudoephedrine would have produced more than 1.5 kilograms of pure methamphetamine. We review such findings for clear error. *United States v. Whitecotton,* 142 F.3d 1194, 1197 (9th Cir.1998) (citing *United States v. Asagba,* 77 F.3d 324, 325 (9th Cir.1996)). For the reasons explained in Part VII above, the district court's finding was not clearly erroneous.

### 3.

▮ Barrera–Medina and Hernandez next argue that the district court commit-

ted reversible error in denying them two-point downward adjustments for acceptance of responsibility pursuant to U.S.S.G. § 3E1.1 because the district court failed to make specific factual findings and merely adopted the relevant findings of the presentence reports. In denying a downward adjustment, "the district court should make clear on the record its resolution of all disputed matters" and "specific findings of fact are to be encouraged." *United States v. Rigby,* 896 F.2d 392, 394 (9th Cir.1990). However, it is sufficient if the district court expressly adopts the findings in the presentence report. *Id.* at 394. Here, the district court noted that it had reviewed the presentence reports for Barrera–Medina and Hernandez, acknowledged that there were written objections, gave the defendants an opportunity to be heard on those objections, and then concluded by expressly adopting the findings of the presentence report. Thus, the district court made sufficient specific findings.

Barrera–Medina and Hernandez argue in the alternative that the district court clearly erred in finding that they had not accepted responsibility and that they are therefore deserving of the two-point downward adjustment. They rely on the facts that they "confessed on the day of their arrests," did not testify or otherwise put on evidence at trial, and did nothing else to increase the trial's length. "The district court's findings of fact regarding a defendant's acceptance of responsibility are reviewed under the clearly erroneous standard, and are entitled to 'great deference on review' because '[t]he sentencing judge is in a unique position to evaluate a defendant's acceptance of responsibility.'" *United States v. Martinez–Martinez,* 369 F.3d 1076, 1088–89 (9th Cir.2004) (quoting *United States v. McKittrick,* 142 F.3d 1170, 1178 (9th Cir.1998)).

We conclude that the district court did not clearly err. A district court may deny a downward adjustment for acceptance of responsibility where the defendant has not admitted to all elements of the charged crime, even if the defendant has admitted to other elements and neither testifies nor presents other evidence at trial. *See, e.g., United States v. Mohrbacher,* 182 F.3d 1041, 1052–53 (9th Cir.1999). Here, although they admitted certain acts, neither Barrera–Medina nor Hernandez confessed to having conspired to manufacture methamphetamine. Indeed, at his sentencing hearing, Hernandez stated: "I am innocent of these charges that I am being charged with." 8/12/03 RT at 1581.

**AFFIRMED in part and REMANDED in part.**

---

\* The Honorable Donald P. Lay, Senior United States Circuit Judge for the Eighth Circuit, sitting by designation.

\*\* This disposition is not appropriate for publi-

cation and may not be cited to or by the courts of this circuit except as provided by Ninth Circuit Rule 36–3.